UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SHEILA POTOCNIK,                                          Case No. 13-CV-2093 (PJS/HB)

              Plaintiff,

v.                                                                                    ORDER

WALTER CARLSON, acting in his
individual capacity as a Sergeant for the
City of Minneapolis Police Department;
CITY OF MINNEAPOLIS; JOHN AND
JANE DOES (1-500), acting in their
individual capacity as supervisors,
officers, deputies, staff, investigators,
employees or agents of the other law-
enforcement agencies; ENTITY DOES (1-
50), including cities, counties,
municipalities, and other entities sited in
Minnesota and federal departments and
agencies; KURT RADKE, acting in his
individual capacity as a Sergeant for the
Minneapolis Police Department; CHRIS
THOMSEN, acting in his individual
capacity as a Sergeant for the
Minneapolis Police Department; LAURA
ROSE TURNER, acting in her individual
capacity as an Officer of the Minneapolis
Police Department,

              Defendants.

Jonathan A. Strauss, Sonia Miller-Van Oort, and Lorenz F. Fett, Jr., SAPIENTIA
LAW GROUP, PLLC, for plaintiff.

Peter G. Mikhail and Adam C. Wattenbarger, KENNEDY & GRAVEN,
CHARTERED, for defendant Walter Carlson.

Andrea K. Naef and Kristin R. Sarff, MINNEAPOLIS CITY ATTORNEY'S OFFICE, for defendants City of Minneapolis, Kurt Radke, Christopher Thomsen, and Laurarose Turner.[1]

Plaintiff Sheila Potocnik brings multiple claims under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. § 2721 et seq., against the City of Minneapolis ("the City") and four members of the Minneapolis Police Department.  Potocnik alleges that the individual defendants unlawfully accessed her driver's-license record and that the City is liable for their conduct.

This matter is before the Court on defendants' motions for summary judgment. For the reasons stated below, the Court grants the motions in part and denies them in part.  Specifically, the Court holds that Potocnik has standing to sue under the DPPA; that all claims against defendants Kurt Radke, Christopher Thomsen, and Laurarose Turner are time-barred; that the City may be held vicariously liable for the conduct of Radke and Turner, but not Thomsen; that Potocnik may not recover liquidated damages without establishing that she suffered actual damages; that Potocnik may recover damages for "garden variety" mental and emotional distress; that Potocnik may recover punitive damages without recovering actual damages; and that the number of times that Carlson obtained Potocnik's personal information in violation of the DPPA is a question for the jury.

---

[1]Although this defendant is identified in the amended complaint as "Laura Rose Turner," defendants' filings indicate that the correct spelling is "Laurarose Turner."

# I. BACKGROUND

## A. The DPPA

The DPPA protects from disclosure "personal information" obtained by state departments of motor vehicles in connection with motor-vehicle records.  18 U.S.C. § 2721(a).  "[P]ersonal information" includes "information that identifies an individual, including an individual's photograph, social security number, driver identification number, name, address (but not the 5-digit ZIP code), telephone number, and medical or disability information . . . ."  18 U.S.C. § 2725(3).

Under the DPPA, it is "unlawful for any person knowingly to obtain or disclose personal information, from a motor vehicle record, for any use not permitted under section 2721(b) . . . ."  18 U.S.C. § 2722(a).  Section 2721(b), in turn, sets out fourteen permissible uses for personal information contained in motor-vehicle records. Permissible uses include "use by any government agency, including any court or law enforcement agency, in carrying out its functions . . . ."  18 U.S.C. § 2721(b)(1).  The subject of a motor-vehicle record may sue any "person who knowingly obtains, discloses or uses [her] personal information, from a motor vehicle record, for a purpose not permitted under this chapter . . . ."  18 U.S.C. § 2724(a).

*B.  Potocnik's Connections to Defendants*

Potocnik is connected in several ways to the Minneapolis police force.  She argues that these connections create an inference that, when defendants accessed her DVS records, they were motivated by curiosity or malice rather than by any legitimate law-enforcement purpose.

In July 2005, Potocnik met Brian Potocnik ("Brian"), a Minneapolis police officer; they began dating in December of that year.  Potocnik Dep. 187.  A couple of months before meeting Potocnik, Brian had been placed on administrative leave after being accused of having sexual contact with a minor.  B. Potocnik Dep. 115-16; Turner Dep. 64-65.  Brian left the Minneapolis Police Department in February 2006.  B. Potocnik Dep. 10.  Potocnik and Brian married in July 2012.  Potocnik Dep. 123.

Brian knows Radke, Thomsen, and Turner from his time as a Minneapolis police officer.  Brian attended the police academy with Radke in 1997.  B. Potocnik Dep. 10-11.  The two were friends and partners on the force; Brian stayed at Radke's home in May 2009 and again in May 2011 when he and Potocnik were having domestic disputes.  Potocnik Dep. 185-86.  Brian also worked with and played on the same softball team as Thomsen, B. Potocnik Dep. 69-70, and socialized with Turner at work, B. Potocnik Dep. 119-22.  Although Brian never met defendant Walter Carlson, Carlson was aware of Brian and the disciplinary proceedings against him.  Carlson Dep. 88-89.

Potocnik has two other connections to the Minneapolis Police Department, both unrelated to her relationship with Brian.  First, Potocnik's brother was in a long-term relationship with Carlson's daughter, and the couple had two children.  Potocnik Dep. 13-14.  In other words, Potocnik is the aunt of two of Carlson's grandchildren. Second, Potocnik's sister, Laura DeMeules, was murdered in 2005, and her murder was investigated by Thomsen.  Thomsen Dep. 6, 8.

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255.

### B.  Standing

Carlson argues that Potocnik lacks standing to sue under the DPPA, citing in support of his argument the recent decision of the United States Supreme Court in

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).   A plaintiff has standing if (1) the plaintiff

suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct of

the defendant; and (3) the injury is likely to be redressed by a favorable judicial

decision.   *Id.* at 1547.   To show injury in fact, the plaintiff must have suffered "'an

invasion of a legally protected interest' that is 'concrete and particularized' and 'actual

or imminent, not conjectural or hypothetical.'"   *Id.* at 1548 (quoting *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 560 (1992)).

  *Spokeo* addressed the meaning of "concrete."   The plaintiff in *Spokeo* brought a

claim under the Fair Credit Reporting Act, alleging that a search of the Internet by the

defendant's search engine had returned incorrect information about him.   *Id.* at 1544.

The Supreme Court remanded the case to the Ninth Circuit, holding that the lower

court had failed to analyze whether this alleged injury was concrete.   *Id.* at 1545.   The

Court clarified that merely alleging a violation of a statutory right is not necessarily

sufficient to establish a concrete injury.   *Id.* at 1549.   Instead, the Court explained, the

injury must be de facto—that is, real as opposed to abstract.   *Id.* at 1548.   The Court

recognized, however, that an injury need not be tangible to be concrete.   *Id.* at 1549.

  Carlson argues that, under *Spokeo*, Potocnik lacks standing because she has

alleged only a violation of a statutory right, and not a concrete injury.   The Court

disagrees.   In *Spokeo*, the Court observed that, in determining whether an intangible

harm meets the test for concreteness, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.* Here, the type of harm at issue—the viewing of private information without lawful authority—has a close relationship to invasion of the right to privacy, a harm that has long provided a basis for tort actions in the English and American courts. *See* Restatement (Second) of Torts § 652A cmt. a (Am. Law Inst. 1977) (describing the history of the tort of invasion of privacy).

This is not to say that, under the circumstances of this case, Potocnik could *win* a tort claim; in fact, the Court has already dismissed Potocnik's invasion-of-privacy claim under Minnesota law. *See* ECF No. 34 at 31-34. But *Spokeo* does not require that the harm created by the violation of a statute be identical to the type of harm that will give rise to a recovery under the common law of any particular jurisdiction. Instead, *Spokeo* speaks broadly about the harm created by violation of a statute having a "close relationship" to a harm that has traditionally "provid[ed] a basis for a lawsuit" in "English [and] American courts." *Spokeo* explicitly recognized that "Congress may 'elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Spokeo*, 136 S. Ct. at 1549 (quoting *Lujan*, 504 U.S. at 578). In other words, the Court made clear that an injury that would *not* give rise to

recovery in a tort action could nevertheless be sufficiently concrete to give a plaintiff standing to seek recovery in a statutory action.

For these reasons, the Court concludes that Potocnik has standing to pursue her claims under the DPPA, even if Potocnik can show nothing more than that defendants invaded her privacy by unlawfully obtaining information about her from the DVS database.[2]  Moreover, even if the invasion of Potocnik's legal right to keep her data private is not a sufficiently concrete harm, Potocnik has also offered evidence that she suffered actual injury in the form of emotional distress.  There is no doubt that emotional distress is an injury in fact or that Potocnik has standing to bring an action seeking compensation for that injury.  The Court therefore rejects Carlson's argument that Potocnik lacks standing.

## C.  Statute of Limitations

Claims under the DPPA are subject to a four-year statute of limitations that begins to run on the date that the violation occurred, even if the plaintiff neither knew nor had reason to know of the violation at that time.  *See McDonough v. Anoka Cty.*, 799 F.3d 931, 943 (8th Cir. 2015).  Defendants Radke, Thomsen, and Turner were not

---

[2]As discussed below, the Court holds that, to recover *damages* on her DPPA claims, Potocnik must prove more than that a defendant unlawfully accessed her DVS record; she must also prove that she suffered actual injury, such as emotional distress or pecuniary harm.  But even if Potocnik cannot prove the type of actual injury that entitles her to *damages*, the unlawful invasion of her privacy establishes injury in fact and thus gives her *standing*.

identified as parties in Potocnik's original complaint, which was filed on August 1,

2013.  ECF No. 1.  Instead, Radke, Thomsen, and Turner were added as defendants in

Potocnik's first amended complaint, which was filed on March 3, 2015.  ECF No. 127.

None of the three defendants is accused of unlawfully accessing Potocnik's DVS record

within four years of March 3, 2015.  Therefore, say these defendants, Potocnik's DPPA

claims against them are time-barred.

Potocnik disagrees.  She contends that her amended complaint relates back to the

filing of her original complaint on August 1, 2013, and therefore, she says, any claims

arising out of a violation that occurred on or after August 1, 2009 are timely.  Potocnik

relies on Fed. R. Civ. P. 15(c)(1)(C), which provides for relation back when "the

amendment changes the party or the naming of the party against whom a claim is

asserted"—but only if, among other things, the party "knew or should have known that

the action would have been brought against it, but for a mistake concerning the proper

party's identity."  In this case, Potocnik sued John and Jane Doe defendants in her

original complaint; once she discovered the identities of the alleged wrongdoers, she

amended her complaint.  Thus, she argues, Rule 15(c)(1)(C) permits relation back.

The Court disagrees, as do almost all of the appellate courts that have addressed

this issue.  As those courts have held, an amendment substituting the name of a real

person for a John Doe defendant does not relate back because the plaintiff did not make

a "*mistake* concerning the proper party's identity."  Fed. R. Civ. P. 15(c)(1)(C) (emphasis

added).  When a plaintiff names a John Doe defendant, she is not asserting that

someone named "John Doe" harmed her; rather, she is asserting that she does not *know*

the name of the person who harmed her.  In no sense is the plaintiff making a

"mistake."[3]  *See Sewell v. Bernardin*, 795 F.3d 337, 342 (2d Cir. 2015); *Bloodworth v. United

States*, 623 F. App'x 976, 979 (11th Cir. 2015); *Whitt v. Stephens Cty.*, 529 F.3d 278, 282-83

(5th Cir. 2008); *Moore v. Tennessee*, 267 F. App'x 450, 455 (6th Cir. 2008); *Garrett v.

Fleming*, 362 F.3d 692, 696 (10th Cir. 2004); *see also Goodman v. Praxair, Inc.*, 494 F.3d 458,

470 -71 (4th Cir. 2007) (en banc) (suggesting that courts should generally avoid parsing

the word "mistake," but stating that "naming Doe defendants self-evidently is no

'mistake' such that the Doe substitute has received proper notice").  *But see Varlack v.

SWC Caribbean, Inc.*, 550 F.2d 171, 174-75 (3d Cir. 1977) (amended complaint replacing

unknown party with defendant's real name related back under Rule 15(c)).[4]

---

[3]Defendants contend that, in *Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001), the
Eighth Circuit endorsed this reasoning in dicta.  In *Foulk*, the Eighth Circuit noted that
amendments substituting a real person for a John Doe defendant "ordinarily will *not* be
treated as relating back to the prior pleading, unless certain conditions set forth in Fed.
R. Civ. P. 15(c) are satisfied."  *Id.* at 696.  The Eighth Circuit was just stating the obvious:
No amended complaint that adds a party will relate back unless the conditions of
Rule 15(c) are satisfied.  The Court therefore does not put much weight on this dicta.

[4]Potocnik cites *Hayes v. Faulkner County*, 388 F.3d 669 (8th Cir. 2004), as an
example of a case in which the Eighth Circuit permitted relation back of a claim against
an individual police officer.  *Hayes* did not involve a John Doe claim, however; instead,
(continued...)

Potocnik contends that the reasoning of these cases is fatally undermined by *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538 (2010). In *Krupski*, the plaintiff initially sued Costa Cruise Lines for injuries she suffered while on a cruise ship. *Id.* at 541-43. Later, after the statute of limitations had expired, the plaintiff amended her complaint to substitute Costa Crociere, which was the proper defendant. *Id.* at 544. Both the district court and the Eleventh Circuit held that the amended complaint did not relate back to the filing of the original complaint because the plaintiff knew or should have known of the existence of Costa Crociere before the statute of limitations expired but chose not to sue it. *Id.* at 545-46. The word "mistake," these courts reasoned, does not "encompass a deliberate decision not to sue a party whose identity the plaintiff knew before the statute of limitations had run." *Id.* at 545.

The Supreme Court rejected this reasoning, explaining that, "[b]y focusing on [the plaintiff's] knowledge, the Court of Appeals chose the wrong starting point." *Id.* at 548. Under Rule 15(c)(1)(C)(ii), the question is not what the plaintiff knew; the question is whether the added defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's

---

[4](...continued)
the underlying district-court opinion indicates that the plaintiff erroneously believed that the individual defendants were immune from suit. *Hayes v. Faulkner Cty.*, 285 F. Supp. 2d 1132, 1143 (E.D. Ark. 2003). This was a "mistake," unlike suing a John Doe.

identity." *Id.*; Fed. R. Civ. P. 15(c)(1)(C).  The Court went on to reject the lower courts'

narrow construction of "mistake":

> That a plaintiff knows of a party's existence does not
> preclude her from making a mistake with respect to that
> party's identity.  A plaintiff may know that a prospective
> defendant—call him party A—exists, while erroneously
> believing him to have the status of party B.  Similarly, a
> plaintiff may know generally what party A does while
> misunderstanding the roles that party A and party B played
> in the "conduct, transaction, or occurrence" giving rise to her
> claim.  If the plaintiff sues party B instead of party A under
> these circumstances, she has made a "mistake concerning the
> proper party's identity" notwithstanding her knowledge of
> the existence of both parties.

*Krupski*, 560 U.S. at 549.

The two appellate courts that have addressed the issue have held that *Krupski*

does not undermine the reasoning of the cases holding that amendments to replace John

Doe defendants do not relate back.  *See Scott v. Vill. of Spring Valley*, 577 F. App'x 81, 82-

83 (2d Cir. 2014) (affirming refusal to permit addition of new individual defendants

because, unlike in *Krupski*, the proposed amendment did not correct a mistake of fact);

*Smith v. City of Akron*, 476 F. App'x 67, 69 (6th Cir. 2012) (distinguishing *Krupski* because

"Smith did not make a mistake about which defendant to sue; he simply did not know

whom to sue or opted not to find out within the limitations period").  *But see Smith v.

City of New York*, 1 F. Supp. 3d 114, 120-21 (S.D.N.Y. 2013) (finding that *Krupski*

overruled previous Second Circuit precedent that disallowed relation back in John Doe

cases—a finding with which the Second Circuit later appeared to disagree).

This Court agrees with those appellate courts.  The question in *Krupski* was

whether a deliberate choice to sue one known, real defendant rather than another

known, real defendant can be considered a mistake.  *Krupski* found that mere

knowledge of a party's existence does not preclude the possibility of being mistaken

about that party's identity or role in the events underlying the lawsuit.  *Krupski*, 560 U.S.

at 548-49.  True, *Krupski* emphasized that the inquiry is focused on the new defendant's

knowledge that it would have been named as a defendant but for a mistake.  *Id.* at 548.

Nevertheless, *Krupski* acknowledged that there *still must be a mistake*:

> When the original complaint and the plaintiff's conduct
> compel the conclusion that the failure to name the
> prospective defendant in the original complaint was the
> result of a fully informed decision as opposed to a mistake
> concerning the proper defendant's identity, the requirements
> of Rule 15(c)(1)(C)(ii) are not met.

*Id.* at 552.  Further, *Krupski* adopted a definition of "mistake" that does not fit the facts

of a John Doe case:

>  A mistake is "[a]n error, misconception, or
> misunderstanding; an erroneous belief."  Black's Law
> Dictionary 1092 (9th ed. 2009); *see also* Webster's Third New
> International Dictionary 1446 (2002) (defining "mistake" as
> "a misunderstanding of the meaning or implication of
> something"; "a wrong action or statement proceeding from
> faulty judgment, inadequate knowledge, or inattention"; "an

erroneous belief"; or "a state of mind not in accordance with
the facts").

*Id.* at 548-49.

As the Court has already explained, a plaintiff who sues a John Doe defendant

does not do so because of an error, misconception, misunderstanding, or erroneous

belief.  Nor has she committed a "wrong" action on account of inadequate knowledge.

Again, when Potocnik sued hundreds of John and Jane Doe defendants, she was not

doing so because she believed that hundreds of people named John Doe or Jane Doe

had unlawfully accessed her DVS information.  Instead, she sued hundreds of

defendants under fictitious names because she did not *know* who had unlawfully

accessed her DVS information—and, by using fictitious names, Potocnik was accurately

communicating that fact.  This is not a "mistake," and thus the Court cannot find that

Radke, Thomsen, and Turner knew or should have known that Potocnik would have

sued them in her original complaint "but for a mistake concerning the proper party's

identity."  Rule 15(c)(1)(C)(ii).  As a result, Potocnik's amended complaint does not

relate back to the filing of the original complaint insofar as it adds claims against Radke,

Thomsen, and Turner.

Potocnik makes one additional argument regarding the statute of limitations.

Citing *Schrader v. Royal Caribbean Cruise Line, Inc.*, 952 F.2d 1008 (8th Cir. 1991), Potocnik

argues that defendants should be equitably estopped from defending on the basis of the

statute of limitations.  In *Schrader*, however, the Eighth Circuit found that there were

questions of fact concerning whether the defendant had actively misled the plaintiff

concerning the identity of the appropriate defendant.  *Id.* at 1014.  There are no such

questions in this case.  Potocnik emphasizes *Schrader*'s assertion that "[a] defendant's

actions making it difficult for the plaintiff to learn the intended defendant's proper

name until after the limitations period expired formed the basis for an equitable

estoppel in *Bechtel v. Robinson*, 886 F.2d 644 (3d Cir.1989)."  *Schrader*, 942 F.2d at 1013.

But in *Bechtel*, the Third Circuit found that the defendant's unlawful conduct—

specifically, violations of state business registration and licensing laws—had misled the

plaintiff as to the identity of the proper defendant and that this misconduct justified the

application of equitable estoppel.  *Bechtel*, 886 F.2d at 648-50.

 Unlike the defendants in *Bechtel* or *Schrader*, the defendants in this case have not

engaged in any dishonest or unlawful conduct that misled Potocnik or prevented her

from bringing timely claims.[5]  As a result, there is no basis on which to estop defendants

---

[5]Potocnik points out that the City did not identify the individual defendants in its initial disclosures, which were due on August 31, 2014.  ECF No. 59 at 2.  Putting aside the fact that the City did not act dishonestly or unlawfully, the City identified the individual defendants on October 3, 2014, *see* Knaef Aff. Ex. 2, and no limitations period expired during the short delay between August 31 and October 3.  True, the limitations period for one access by Radke expired the next day, but Potocnik waited nearly three months to move to amend her complaint to add a claim against Radke, ECF No. 117, indicating that the short delay was inconsequential.  (Citing Exhibit 32 to Jonathan Strauss's affidavit, the City contends that it provided the names in mid-September 2014;

(continued...)

from relying on the statute of limitations.  The Court therefore grants summary

judgment in favor of Radke, Thomsen, and Turner.

### D.  The City's Liability

The City moves for summary judgment on the basis that (1) Potocnik does not

have sufficient evidence to prove that the City is directly liable to her and (2) the City

cannot be held vicariously liable to Potocnik under the DPPA.

### 1.  Direct Liability

Potocnik contends that the City is directly liable to her because it disclosed her

DVS record to the individual officers by facilitating their access to the DVS database.

This is incorrect as a factual matter; the information in the DVS database was disclosed

by the Department of Public Safety, not by the City.  Moreover, even if the City had

disclosed the information to the officers, Potocnik makes no effort to show that the City

did so for a purpose not permitted under the DPPA.  *See Weitgenant v. Patten*, No. 14-

255 (ADM/FLN), 2016 WL 1449572, at *4 (D. Minn. Apr. 12, 2016) ("To violate the

DPPA, a defendant itself must have acted with an impermissible purpose; it is not

enough that the defendant discloses information to one who subsequently uses it for an

impermissible purpose.").

---

[5](...continued)
that exhibit is dated September 2015, however.)

To the extent that Potocnik is arguing that the City is liable because it did not

determine the reason for each and every one of the thousands of accesses of the DVS

database by its police officers, the Court rejects Potocnik's contention.  There is no

evidence that the City facilitated access to the database for any reason other than to

enable its officers to carry out their law-enforcement duties, which is a purpose

permitted by the DPPA.[6]  18 U.S.C. § 2721(b)(1); *cf. McDonough v. Anoka Cty.*, 799 F.3d

931, 956-57 (8th Cir. 2015) (holding that Department of Public Safety commissioners had

qualified immunity from liability for negligently or recklessly granting access to the

DVS database).

Finally, Potocnik points to a "DVS Business Partner Records Access Agreement"

that government entities signed in order to gain access to the DVS database.  *See* Strauss

Aff. Ex. 34; Jacobson Dep. 76-78.  Potocnik contends that this agreement requires each

entity to be responsible for its own misuse of the DVS database, and that somehow this

requirement creates direct liability *to her* on the part of Minneapolis for its officers'

misuse.  Potocnik is mistaken.  The agreement is a private contract that has nothing to

do with whether or how the City can be found directly liable under a federal statute.

---

[6]At oral argument, Potocnik vaguely suggested that the City could be directly liable under the standards articulated in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  Potocnik made no such argument in her brief, however, and thus the Court declines to address it.

2.  Vicarious Liability

Potocnik argues that the City is liable to her merely because it employed the

officers who allegedly violated the DPPA.  Although Potocnik frames this as an

argument for direct liability, it is, in fact, an argument for vicarious liability.  *See Monell*

*v. Dep't of Social Servs.*, 436 U.S. 658, 691-92 (1978) (liability that arises solely because the

defendant employed the tortfeasor is vicarious liability).  Potocnik also makes an

explicit argument that the City is vicariously liable for its officers' violations of the

DPPA.

Courts have split on whether a municipality can be held vicariously liable for

DPPA violations committed by its employees.  *Compare Weitgenant*, 2016 WL 1449572,

at *5-7 (holding that there is no vicarious liability under the DPPA), *with Margan v. Niles*,

250 F. Supp. 2d 63, 72-75 (N.D.N.Y. 2003) (finding that there is vicarious liability under

the DPPA).  Although the question is close, the Court ultimately agrees with *Margan*

that a municipality can be held vicariously liable under the DPPA.  In American law,

vicarious liability is the rule, not the exception, and the Court can discern no reason

why DPPA cases should be exempt from the general rule.

*Margan* relied heavily on *American Society of Mechanical Engineers, Inc. v.*

*Hydrolevel Corp.*, 456 U.S. 556 (1982), in which the Supreme Court found that an entity

could be held vicariously liable for the unlawful acts of its agents under the antitrust

laws.  Like *Margan*, the Court finds the analysis in *Hydrolevel* to be instructive.  The

Supreme Court first observed that, "[i]n a wide variety of areas, the federal courts . . .

have imposed liability upon principals for the misdeeds of agents acting with apparent

authority."[7]  *Hydrolevel*, 456 U.S. at 568.  As the Supreme Court put it, "[t]he apparent

authority theory has long been the settled rule in the federal system."  *Id.* at 567.

Starting from that baseline, the Supreme Court found no reason to depart from

the general rule in antitrust cases.  In particular, the Court found vicarious liability to be

"consistent with the congressional intent to encourage competition."  *Id.* at 570.  The

threat of vicarious liability furthers that goal:  It gives the employer, who is in the best

position to prevent antitrust violations, the incentive to take the kind of systematic

measures that would be most effective in preventing violations.  *Id.* at 572-73.  The same

is true here.  The City is in the best position to take systematic steps to prevent DPPA

violations by its employees, and vicarious liability gives it an incentive to do so.

As many courts have noted, Congress was concerned about the impact of the

DPPA on legitimate law-enforcement functions.  To alleviate that concern, courts

---

[7]Potocnik seems to base her claim for vicarious liability solely on the theory of apparent authority.  *See* ECF No. 190 at 41-42; *see generally Faragher v. City of Boca Raton*, 524 U.S. 775, 801-02 (1998) (liability under a theory of apparent authority includes both cases involving the abuse of apparent authority and cases in which tortious conduct is made possible or facilitated by the existence of the actual agency relationship).  As the City has not argued that Potocnik's evidence is insufficient to establish liability under this theory, the Court need not address that question.

typically give a broad reading to the government-function exception in 18 U.S.C.

§ 2721(b)(1).  But once a law-enforcement officer has exceeded the broad bounds of the

government-function exception, shielding his employer from vicarious liability serves

no purpose other than to weaken the municipality's incentive to prevent future

violations.  Given that legitimate law-enforcement work is amply protected by

§ 2721(b)(1), the Court sees no conflict between the availability of vicarious liability

against municipalities and the purposes of the DPPA.

Finally, the Court notes that it sees nothing in the language of the DPPA that

precludes vicarious liability.  It is true, as the City argues, that the DPPA creates a cause

of action against "[a] person who knowingly obtains, discloses or uses personal

information, from a motor vehicle record, for a purpose not permitted under this

chapter . . . ."  18 U.S.C. § 2724(a).  But such language is not incompatible with the

existence of vicarious liability; in fact, the relevant statutory language in *Hydrolevel* is

similar.  *See Hydrolevel*, 456 U.S. at 564 (noting that plaintiff brought its suit under 15

U.S.C. §§ 1 and 2); 15 U.S.C. § 1 (imposing criminal liability on "[e]very person who

shall make any contract or engage in any combination or conspiracy hereby declared to

be illegal"); 15 U.S.C. § 2 (imposing criminal liability on "[e]very person who shall

monopolize . . . any part of the trade or commerce among the several States, or with

foreign nations"); 15 U.S.C. § 15(a) (creating a right of action in "any person who shall

be injured in his business or property by reason of anything forbidden in the antitrust laws"). Moreover, although Congress specifically exempted states and state agencies from the definition of "person" under the DPPA, Congress conspicuously did not exempt municipalities. 18 U.S.C. § 2725(2). The Court therefore agrees with *Margan* that vicarious liability is compatible with the DPPA. *See Margan*, 250 F. Supp. 2d at 72-75.

The City next argues that it is not vicariously liable for Potocnik's claims against Turner, Thomsen, and Radke because those individuals are not directly liable. The City argues—in conclusory fashion and without citing any relevant authority—that an employer cannot be held vicariously liable for the unlawful conduct of an employee when the underlying claim against the employee is barred by the statute of limitations. *See* ECF No. 183 at 26-27. Potocnik did not respond to the City's argument.

This is an important and complicated issue on which different jurisdictions have adopted different rules. *See generally Byrd v. J Rayl Transp., Inc.*, 106 F. Supp. 3d 999, 1001-02 (D. Minn. 2015) (discussing decisions from around the country). Given that the City has not adequately briefed the issue and Potocnik has not briefed the issue at all, the Court will not rule on the issue nor grant the City's motion on this basis.

The City next argues that Potocnik has not offered sufficient evidence that Turner's and Thomsen's accesses were for an improper purpose.[8]  The Court agrees with respect to Thomsen, but not with respect to Turner.

Turner accessed the DVS records of both Sheila and Brian Potocnik within a minute of each other on July 23, 2010.[9]  Turner Dep. 54-56.  Turner does not remember looking up these records nor why she did so.  Turner Dep. 54-55, 58, 60.  Turner knew Brian, B. Potocnik Dep. 121-22, and accessed his DVS record on the day after he was placed on administrative leave in 2005, Turner Dep. 64-65.  Turner also does not remember looking up Brian's record in 2005 nor why she did so.  Turner Dep. 57-58.

This evidence is thin, but the Court concludes that this evidence is (barely) sufficient to create an issue of fact concerning whether Turner looked up the Potocniks out of curiosity.  Given that Turner knew of Brian and his disciplinary history, had

---

[8]The City also asserts that it is not vicariously liable for Radke's access because that access was conducted for a law-enforcement purpose and because Radke is entitled to qualified immunity.  ECF No. 183 at 26-27.  Radke made no such argument, however, and the Court assumes that the City's reference to Radke in its argument about vicarious liability was mistaken.  To the extent it was not, the Court will not grant summary judgment on this basis because the City presented no argument in support of its assertions.

[9]Turner testified that she normally remained logged in to the DVS database in her squad-car computer throughout her shifts and that it was common for one officer to access the database through another officer's computer.  Turner Dep. 50-53.  The City therefore suggests that someone else may have used Turner's account to access the Potocniks' records.  This possibility simply raises a factual issue, however; it does not entitle the City to summary judgment.

previously accessed Brian's DVS record under suspicious circumstances, and then later

looked up both Potocnik and Brian at the same time for no obvious legitimate reason, a

jury could infer that Turner acted unlawfully. *Cf. McDonough*, 799 F.3d at 950 (noting

that a history and pattern of suspicious accesses can raise a plausible claim of a DPPA

violation). The Court therefore denies the City's motion with respect to Potocnik's

claim that the City is vicariously liable for Turner's access.[10]

As to Thomsen, however, the Court finds that Potocnik does not have sufficient

evidence to prove that he accessed her DVS record for an impermissible purpose. As

noted, Thomsen is a homicide investigator who assisted in the investigation of the 2005

---

[10]The City also claims that it is entitled to qualified immunity on the vicarious-liability claim.

To the extent that the City is arguing that Turner is entitled to qualified immunity—and, because Turner is not directly liable, the City is not vicariously liable—the City's premise is incorrect. As noted, a jury could find that Turner accessed Potocnik's DVS record out of curiosity—and, if she did, she is not entitled to qualified immunity because her conduct clearly violated the DPPA.

To the extent that the City is instead arguing that it is entitled to qualified immunity because it is not clearly established that municipalities can be held vicariously liable under the DPPA, the Court also rejects this argument. The point of qualified immunity is to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *McDonough*, 799 F.3d at 955 (citation and quotations omitted). Applying the doctrine of qualified immunity in this context would not further the doctrine's purpose, as vicarious liability is no-fault liability that does not turn on any decision made by the City. Not surprisingly, the City was unable to cite any authority for the proposition that municipalities are entitled to the protection of qualified immunity on a vicarious-liability claim.

murder of Potocnik's sister, Laura DeMeules.  Thomsen accessed Potocnik's record on

November 4, 2009.  Knaef Aff. Ex. 13 (user 8).  Thomsen has never met Potocnik and

testified that he had never heard of her before he accessed her DVS record in 2009.

Thomsen Dep. 22-23.

     Thomsen's access of Potocnik's DVS record came about as a result of an inquiry

from the Bureau of Criminal Apprehension ("BCA").  Specifically, Michael Wold, a

special agent with the BCA, contacted Thomsen to ask whether there were similarities

between the DeMeules case and other murders under investigation.  Thomsen Dep. 10;

Wold Decl. ¶ 6.  Thomsen testified that, in order to refresh his recollection of Laura

DeMeules, he searched the DVS database for the name "DeMeules" (Potocnik's

surname at the time[11]) and clicked through records of females of a similar age with that

last name.  Thomsen Dep. 11-12, 26.  The audit report for Thomsen's November 4, 2009

lookups reflects that, consistent with his testimony, he accessed the DVS records of

multiple women with the last name "DeMeules."  Strauss Aff. Ex. 28.

---

[11]In 2009, Potocnik had not yet married Brian, and her surname was DeMeules.
Potocnik Dep. 124.  Nevertheless, the audit report, which was created in 2014, lists
lookups on November 4, 2009 for "Shelia [sic] DeMeules" and "Sheila Lavonne
Potocnik."  Strauss Aff. Ex. 28.  Thomsen testified that he conducted a search using the
name "DeMeules" and does not know how the system might be configured to associate
records with different last names.  Thomsen Dep. 26-30.  It is unclear why (or whether)
Potocnik's name would have appeared in the database in 2009 under the name
"Potocnik," given that Potocnik was not yet married to Brian.

Potocnik does not dispute that Wold contacted Thomsen about the DeMeules murder.  Nevertheless, Potocnik contends that there is a factual issue concerning the reason for Thomsen's accesses of her DVS record.  Potocnik points out that Thomsen knows both Carlson and Brian and contends that, as a result, Thomsen was probably curious about her.  Potocnik Dep. 179.  But there is no evidence that Thomsen knew anything about Potocnik, who was not married to Brian at the time of the lookups.  And even if Thomsen did know of Potocnik, this would be an extraordinarily thin reed on which to hang a finding of an improper purpose, particularly as Brian had not worked for the Minneapolis police force since 2006, B. Potocnik Dep. 10, and as Thomsen had not looked up Potocnik until he was contacted by the BCA in 2009.

Potocnik also points out that Thomsen accessed her record twice for several minutes and that both accesses occurred after he had already accessed Laura DeMeules's record.  Strauss Aff. Ex. 28.  Given the lack of evidence that Thomsen knew anything about Potocnik and the lack of any pattern of suspicious accesses, this is not sufficient to create an issue of fact concerning the reason for Thomsen's accesses of Potocnik's record.  It is undisputed that Thomsen had a legitimate reason to look up records of women with the last name of DeMeules in order to refresh his recollection of Laura DeMeules.  Going back and forth between multiple DeMeules records—and even digging into each record to see multiple photographs—is completely consistent with

that purpose.  The fact that Thomsen knew people whom Potocnik also knew is not sufficient to create an issue of fact concerning the reason for Thomsen's lookups.  *Cf. McDonough*, 799 F.3d at 954-55 (affirming dismissal of claims involving a few scattered accesses lacking the specificity necessary to create a reasonable inference of improper access).

The Court therefore holds that, because Thomsen cannot be held directly liable for accessing Potocnik's DVS record, the City cannot be held vicariously liable.  The City's motion for judgment on this claim is granted.

### E.  Damages

Carlson seeks judgment on a number of issues concerning damages.  Specifically, he argues that (1) Potocnik cannot recover liquidated damages without proving actual damages; (2) "actual damages" are limited to pecuniary damages; (3) even if "actual damages" include emotional injury, Potocnik cannot recover damages for "garden variety" emotional injury; and (4) Potocnik cannot recover punitive damages without proving actual injury.  The Court considers each argument in turn.

### 1.  Requirement of Actual Injury

The DPPA provides that "[t]he court may award . . . actual damages, but not less than liquidated damages in the amount of $2,500 . . . ."  18 U.S.C. § 2724(b)(1).  The

parties dispute whether this provision requires Potocnik to prove actual damages before she can recover liquidated damages.

Potocnik argues that she may recover liquidated damages even if she cannot recover actual damages. Two appellate courts agree with her. *See Pichler v. UNITE*, 542 F.3d 380, 397-400 (3d Cir. 2008); *Kehoe v. Fid. Fed. Bank & Tr.*, 421 F.3d 1209, 1212 (11th Cir. 2005). This Court does not, however. Instead, this Court finds that both the structure of § 2724(b)(1) and its use of the term "liquidated damages" indicate that a plaintiff may not recover liquidated damages unless she can prove that she was actually injured in some way.

As to the structure of the provision: Section 2724(b)(1) authorizes a court to award "actual damages, *but not less than* liquidated damages in the amount of $2,500." (Emphasis added.) This strongly suggests that the liquidated-damages clause is not a standalone remedy, but is instead closely connected to, and dependent on, the actual-damages clause. In other words, § 2724(b)(1) does not grant independent authority to award liquidated damages; instead, it grants authority to award actual damages, and the authority to grant liquidated damages is derived from that authority. If Congress intended to grant authority to award liquidated damages that was independent of the authority that Congress granted to award actual damages, then the wording of the statute—"actual damages, *but not less than* liquidated damages . . ."—would be very

odd, especially given that it would have been very easy for Congress to make its

intention clear.  *Cf.* 17 U.S.C. § 504(a) (allowing damages for copyright infringement of

"either—(1) the copyright owner's actual damages . . .; or (2) statutory damages").  The

much more natural reading is that the phrase "but not less than" indicates that the

$2,500 in liquidated damages is meant to be a floor for an award of actual

damages—when there *is* an award of actual damages.

As to the term "liquidated damages":  As both *Pichler* and *Kehoe* recognize, the

term "liquidated damages" derives from the law of contracts and reflects the parties'

agreement regarding the scope of the loss or injury that is reasonably likely to occur in

the event of a breach.  *See Pichler*, 542 F.3d at 393.  Generally, such clauses are

enforceable "when, at the time the parties enter into the contract containing the clause,

the circumstances are such that the actual damages likely to flow from a subsequent

breach would be difficult for the parties to estimate or for the nonbreaching party to

prove, and the sum agreed upon is designed merely to compensate the nonbreacher for

the other party's failure to perform."  24 Williston on Contracts § 65:1 (4th ed. 2016).

In other words, the common law closely ties the award of liquidated damages to

proof of actual damages.  True, a few older cases have said that it is not necessary to

prove any injury in order to recover liquidated damages.  *See Rex Trailer Co. v. United*

*States*, 350 U.S. 148, 153 (1956) (noting that "the fact that no damages are shown is not

fatal" to the availability of liquidated damages in a case under the Surplus Property Act

of 1944, but further noting that the government had "obvious[ly]" suffered injury from

the violation).  The general rule, however, is that a plaintiff must show actual harm to

recover liquidated damages.  *See* 24 Williston on Contracts § 65:33 (4th ed. 2015) ("it is

now generally agreed . . . that some actual harm is required to support enforcement of a

stipulated damages provision. . . . it is generally held that an otherwise enforceable

liquidated damages clause is not enforceable when there is no actual loss"); Restatement

(Second) of Contracts § 356 cmt. b(4) (Am. Law Inst. 1981) (where it is clear that breach

caused no loss, liquidated damages are not recoverable).

 The general rule makes sense, as the purpose of liquidated damages is to

compensate, not to punish.  24 Williston on Contracts § 65:33.  Indeed, a court will not

enforce a liquidated-damages clause if the court concludes that the clause is functioning

as a penalty.  Restatement (Second) of Contracts § 356(1).  As a result, when there is *no*

damage or injury, liquidated damages necessarily cannot be awarded.  *See*, *e.g.*, *In re CP*

*Holdings, Inc.*, 206 F. App'x 629, 630-31 (8th Cir. 2006) (per curiam) (under Missouri law,

there must be some showing of harm or damage resulting from breach for plaintiff to

recover contractual liquidated damages); *Sterk v. Redbox Automated Retail, LLC*, 672 F.3d

535, 538 (7th Cir. 2012) ("liquidated damages are intended to be an estimate of actual

damages," and in the absence of injury, "the only possible estimate of actual damages . . . would be zero").

In sum, both the structure and the language of the DPPA indicate that Congress intended that plaintiffs must prove some injury in order to recover actual damages—but, recognizing that the emotional injuries that would often result from DPPA violations would be difficult to quantify, Congress provided an actual-damages floor (labeled as "liquidated damages") of $2,500.  *See FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) (when Congress uses a term of art, courts presume that it knows and adopts the specialized meaning of the term).

Potocnik nevertheless contends that *Doe v. Chao*, 540 U.S. 614 (2004), supports her argument that she need not prove actual injury.  In *Doe*, the Supreme Court held that it is necessary to prove actual injury in order to recover statutory damages under the Privacy Act.  *Id.* at 616.  The Court based its holding in part on the language of the Privacy Act, which provides that the United States is liable for "'actual damages sustained by the individual . . ., but in no case shall a person entitled to recovery receive less than the sum of $1,000[.]'"  *Id.* at 619 (quoting 5 U.S.C. § 552a(g)(4)).  Because an award of statutory damages was restricted to "person[s] entitled to recovery," the Court held that a plaintiff must prove actual damages to qualify for that award.  *Id.* at 620-21.

It is true, as Potocnik observes, that the language on which the Supreme Court relied in *Doe* is not found in the DPPA.  It does not follow, however, that the DPPA does not require proof of actual injury.  Congress often says the same thing in different ways.  The language of the DPPA differs from the language of the Privacy Act, but the language of the DPPA nevertheless indicates that a plaintiff must prove injury in order to recover liquidated damages.

Potocnik also points out that proof of actual injury is not required to recover for invasion of privacy under the common law.  *See Pichler*, 542 F.3d at 398-99.  But to recover for invasion of privacy, a plaintiff must clear a very high hurdle.  *See Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (requiring a highly offensive intrusion or disclosure).  Conduct that violates the DPPA is generally far less egregious than conduct that constitutes an invasion of privacy.  *See* ECF No. 34 at 31-32.  It makes sense to presume damages under the common law, given what a plaintiff must prove to be entitled to *any* recovery.  It makes less sense to presume damages under the DPPA, given that most of the information that the DPPA protects is not terribly personal or sensitive—and, in fact, is routinely exposed to total strangers, such as when someone boards a plane, buys alcohol or cigarettes, or cashes a check.

The Court therefore holds that, to recover liquidated damages for a DPPA violation, Potocnik must first prove that she suffered actual injury.

2.  Remaining Damages Issues

Citing *FAA v. Cooper*, 132 S. Ct. 1441 (2012), Carlson next argues that "actual

damages" are limited to pecuniary damages and do not include non-economic harm

(such as emotional distress).  The Court disagrees, because (1) *Cooper* is distinguishable

and (2) it would make no sense to limit DPPA plaintiffs—who rarely suffer economic

injuries—to recovering only pecuniary damages.

In *Cooper*, the Supreme Court held that "actual damages" under the Privacy Act

are limited to economic losses.  *Id.* at 1446.  Notably, however, the Court reached its

decision in the course of discerning the scope of the Privacy Act's waiver of sovereign

immunity.  *Id.* at 1448.  In particular, the Court framed the issue as "whether the civil

remedies provision of the Privacy Act waives the Government's sovereign immunity

with respect to" damages for mental and emotional distress.  *Id.*  Because a waiver of

sovereign immunity must be unequivocal, and because the term "actual damages" is

ambiguous, the Court found no waiver of immunity with respect to such damages.  *Id.*

at 1448-50, 1453.

Here, however, the scope of the federal government's waiver of sovereign

immunity is not at issue, and the Court is therefore not required to give a narrow

reading to the term "actual damages."  Instead, as *Cooper* indicates, the Court "must

consider the particular context in which the term appears."  *Id.* at 1450 (footnote

omitted).  The DPPA is a crime-fighting, privacy-protecting measure that was enacted

partly in response to the murder of actress Rebecca Schaeffer, who was killed after a

deranged fan obtained her address from a motor-vehicle database.  *See Taylor v. Acxiom*

*Corp.*, 612 F.3d 325, 336 (5th Cir. 2010) (explaining impetus for DPPA); *see also Dahlstrom*

*v. Sun-Times Media, LLC*, 777 F.3d 937, 944 (7th Cir. 2015) ("The DPPA was enacted as a

public safety measure, designed to prevent stalkers and criminals from utilizing motor

vehicle records to acquire information about their victims.").  Such invasions of privacy

will rarely result in pecuniary loss, but often cause emotional distress.  It is highly

unlikely that Congress intended to deprive the very type of victim who inspired

passage of the DPPA—that is, victims like Rebecca Schaeffer—from any recovery under

the Act.  Clearly, then, the purpose and context of the DPPA counsel a broader

interpretation of "actual damages."

Carlson also cites the legislative history of the DPPA, contending that it supports

a narrower meaning of "actual damages."  Specifically, Carlson points out (as *Cooper*

noted) that the Privacy Act established a commission to study various issues, including

whether to permit the recovery of "general damages"—that is, damages for pain and

suffering.  *See Cooper*, 132 S. Ct. at 1452.  The commission eventually recommended that

the Privacy Act be amended to permit the recovery of such damages, but Congress did

not act on that recommendation.  *Id.*  The Supreme Court cited this history as further

evidence that "actual damages" are distinct from "general damages" and that the latter are not recoverable under the Privacy Act. *Id.*

Carlson points out that some Congressional supporters of the DPPA stated that the law incorporates the intent of the Privacy Act as well as the commission's recommendations. ECF No. 181 at 3-4. According to Carlson, these statements indicate that Congress intended for the remedies in the DPPA to mirror those in the Privacy Act—that is, to exclude the recovery of non-economic losses. To the contrary, however, these statements seem to undermine Carlson's argument, at least in part: They indicate an intent to follow the commission's recommendations—one of which was to *allow* recovery for pain and suffering.

Concededly, the DPPA did not use the commission's recommended statutory language of "general damages." At most, though, that simply renders the legislative history inconclusive and confusing. Moreover, at the time that the DPPA was enacted in 1994, some courts held that the Privacy Act did, in fact, allow for the recovery of damages for mental and emotional distress. *See Doe*, 540 U.S. at 627 n.12 (noting a circuit split on the issue). It would be a mistake, therefore, to read too much into Congress's failure to specify that "general damages" are recoverable under the DPPA. As *Cooper* repeatedly acknowledges, "actual damages" is an ambiguous term whose

meaning depends on the context in which it is used.  In the context of the DPPA, the Court finds that "actual damages" includes damages for mental and emotional distress.

Carlson next argues that, even if damages for mental and emotional distress are recoverable, a plaintiff should not be allowed to recover for "garden variety" emotional distress.  The Court rejects this view.  Nothing in the statute establishes such a threshold, and, in the Court's experience, such thresholds are utterly unworkable in practice.  The Court will not impose a greater-than-garden-variety threshold unless the DPPA requires it, and nothing in the DPPA requires it.  *See Edeh v. Midland Credit Mgmt., Inc.*, 748 F. Supp. 2d 1030, 1041-42 (D. Minn. 2010) (holding that, because FDCPA authorizes recovery for "any actual damage," no heightened showing of emotional distress was required).

Finally, Carlson argues that, as a general matter, plaintiffs cannot recover punitive damages unless they can prove an actual injury.  There is conflicting authority in the Eighth Circuit on this issue.  *Compare Cronin v. Sears, Roebuck & Co.*, 588 F.2d 616, 620 (8th Cir. 1978) ("based on our finding that plaintiffs were not entitled to actual damages, it is clear that they would not be eligible to collect punitive damages"), *with Goodwin v. Circuit Court of St. Louis Cty., Mo.*, 729 F.2d 541, 548 (8th Cir. 1984) ("As to the claim that punitive damages may not be awarded unless actual damages are proved, this is not the law."), *and Salitros v. Chrysler Corp.*, 306 F.3d 562, 574 (8th Cir. 2002) ("Our

Circuit long ago rejected the notion that compensatory damages, as opposed to nominal damages, were prerequisite to an award of punitives." (citing *Goodwin*)).

The Court need not try to discern the Eighth Circuit's position, however, because even courts that hold that punitive damages are generally not recoverable in the absence of compensatory damages recognize that the language of a statute can overcome that default rule. *See People Helpers Found., Inc. v. City of Richmond, Va.*, 12 F.3d 1321, 1326-27 (4th Cir. 1993). In this case, the structure of the DPPA's damages provision indicates that punitive damages are recoverable even in the absence of compensatory damages. *See* 18 U.S.C. § 2724(b) ("The court may award—(1) actual damages, . . . (2) punitive damages upon proof of willful or reckless disregard of the law"). The Court therefore denies Carlson's motion on the issue of punitive damages.

## F.  Number of Lookups

Carlson asks the Court to rule that he "obtain[ed]" Potocnik's DVS data only one time. *See* 18 U.S.C. § 2724(a) (person who "knowingly obtains" personal information from a motor vehicle record for an impermissible purpose is liable to the subject of the information). In a prior case, this Court held that the DPPA protects information, and that information is "obtain[ed]" when it enters a person's mind. *Delaney v. Beltrami Cty.*, No. 14-0358, 2014 WL 5406884, at *2 (D. Minn. Oct. 21, 2014). Carlson argues that, if the

Court is correct, then logically he can "obtain[]" DVS information only once, no matter how many times he accesses a DVS record.

The Court disagrees.  To begin with, the record does not reflect whether the information in Potocnik's DVS record changed over time—and thus it is possible that Carlson obtained new information when he accessed that record a second or third or fourth time.  Setting that aside, human memory is fallible; it is possible to "obtain" the same information more than once.  And finally, even if the information in Potocnik's record never changed, and even if Carlson has a photographic memory, Carlson's repeated accesses would allow him to confirm that Potocnik's information had not changed.  The Court therefore declines to rule, as a matter of law, that Carlson obtained Potocnik's information only once.

That said, the Court notes that the parties seem to dispute whether clicking through separate tabs within Potocnik's DVS record during a single session counts as separate "obtainments."  In the Court's view, once Carlson accessed Potocnik's record, any steps he took to navigate through that record during a continuous session do not count as separate obtainments.  Otherwise, the extent of a defendant's liability would depend on the way that a particular state DMV displayed data.  The Court can conceive of no reason why a police officer who looks at a name and address should be found to have committed one violation if the name and address appear together under one tab,

but two violations if they appear separately under two tabs. The Court will leave it to the jury to apply this holding to the facts of this particular case.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  The motion of defendants City of Minneapolis, Kurt Radke, Chris Thomsen, and Laurarose Turner for summary judgment [ECF No. 165] is GRANTED IN PART and DENIED IN PART.

    a.  The motion is GRANTED with respect to all claims against Radke, Thomsen, and Turner, and those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

    b.  The motion is GRANTED with respect to all claims of direct liability against the City of Minneapolis, and all such claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

    c.  The motion is GRANTED with respect to claims that the City of Minneapolis is vicariously liable for Thomsen's accesses, and all such claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

    d.  The motion is DENIED in all other respects.

2.      Defendant Walter Carlson's motion for summary judgment [ECF No. 160]

is GRANTED IN PART and DENIED IN PART.

a.      The motion is GRANTED to the extent that the Court holds that, in

order to recover liquidated damages under 18 U.S.C. § 2724(b),

plaintiff must prove that she suffered actual damages.

b.      The motion is DENIED in all other respects.

Dated: July 15, 2016                          s/Patrick J. Schiltz
                                              Patrick J. Schiltz
                                              United States District Judge